C.W. HOSKINS HEIRS, a non-resident Partnership consisting of C. Bruce Hoskins, Walter S. Hoskins, Constance D. Wells and Gary C. Hoskins, Appellants

v.

Ben BOGGS, Jr., et al., Appellees.

No. 2005–SC–000618–DG.

Supreme Court of Kentucky.

Dec. 20, 2007.

William A. Hoskins, III, Jay E. Ingle, Jackson Kelly PLLC, Lexington, KY, Counsel for Appellants.

Phillip Lewis, Hyden, KY, Counsel for Appellees.

Opinion of the Court by Justice SCOTT.

This was an action to quiet title to a 155 acre tract of coal (the disputed tract) in Leslie County, Kentucky. The action started as an interpleader action filed by the coal company mining the coal, Bledsoe Coal Leasing Company (Bledsoe) against its own competing claimants/Lessors, Appellant, C.W. Hoskins Heirs, a non-resident partnership (Hoskins Heirs) and Appellees, the Boggs Heirs (Boggs Heirs). The Hoskins Heirs thereafter filed a counterclaim against Bledsoe for mining royalties it had paid to the Boggs Heirs for coal mined from the disputed tract and both the Hoskins Heirs and Boggs Heirs filed cross-claims against each other seeking to quiet their competing titles under their separate leases to Bledsoe.[1]

On June 5, 2002, the Leslie Circuit Court entered Summary Judgment finding the Boggs Heirs to be the owners of the disputed tract, dismissing all other claims of the Hoskins Heirs against the Boggs Heirs and Bledsoe. By opinion rendered July 8, 2005, the judgment of the trial court was affirmed by the Court of Appeals. Pending the opinion by the Court of Appeals, the Hoskins Heirs and Bledsoe settled all matters between them, leaving only the issues as to the title to the disputed tract between the Hoskins Heirs and Boggs Heirs. Thereafter this court granted discretionary review to consider the questions presented.

■ Among other issues,[2] the Hoskins Heirs, assert that the trial court (1) erred

---

1. The issue of "adverse possession" was not raised in the Cross-Claims.

2. The Hoskins Heirs also contend that the doctrine of "attornment," KRS 383.100, voids any title of the Boggs Heirs, since Bledsoe already had a lease with Appellant. The at-

tornment statute, KRS 383.100, however, only applies to the relationships between a lessor and lessee. It cannot be used to directly invalidate another title. *Cf. Great Western Land Management, Inc. v. Slusher,* 939 S.W.2d 865, 868 (Ky.1996)("The attornment

in determining that the October 3, 1881 deed to the Boggs Heirs' predecessor in title (Silas Boggs) was *not ambiguous* and (2) therefore erred in not considering extrinsic evidence offered by the Hoskins Heirs to show the parties intent as to what was intended to be conveyed by the parties, as well as (3) improperly granting summary judgment while there were material issues of fact outstanding. Having determined that the deed to Silas Boggs is in fact "ambiguous," thus necessitating consideration by the trial court of any admissible extrinsic evidence relevant to the intention of the parties, and that otherwise, material issues of fact existed at the time of summary judgment, we hereby reverse the opinion of the Court of Appeals and vacate the judgment of the trial court, but only as to the issues of title between the Hoskins Heirs and the Boggs Heirs, and remand this matter back to the trial court for further proceedings consistent with this opinion

### FACTS

Pursuant to a purported survey dated March 18, 1845, Henry M. Lewis obtained a patent for approximately five-hundred (500) acres of property (Patent No. 8158) located on both Lewis Creek and Rockhouse Creek of the Greasy Fork of the Kentucky River, in Leslie County, Kentucky.[3] The disputed tract falls within the boundaries of this patent. Although the patent itself refers only to property on Lewis Creek, it is undisputed that it extended into Rockhouse Creek and covered the disputed property. The patent is located in the forested mountains of Eastern Kentucky.

The patent contained thirteen calls to, and from, the beginning point, "two dogwoods, [a] black oak and hickory at the head of the right hand fork of [Lewis Creek]." Of these thirteen calls, *only one*, the first call from the beginning point "to two black oaks and [a] maple" was actually surveyed on the ground. The other twelve calls were projected to "stakes." This type of patenting technique used in Kentucky's earlier years is referred to in common parlance as a "stake patent."

"Stake patents," although valid in Kentucky, have nevertheless engendered a multitude of litigation, both as to the location of their boundaries, as well as, overlaps with other adjacent patents.

> It will be observed that the two first corners of the tract are corners of Smith's survey, and that all the other corners of the patent are located at stakes. The fact that no timber is called for [, only stakes,] would seem to indicate that this patent was, perhaps, laid out by protraction, and that the surveyor did not in fact run the lines.

*Creech v. Johnson*, 116 Ky. 441, 76 S.W. 185, 187 (1903). Yet, as was noted in *Uhl v. Reynolds*, 23 Ky.L.Rptr. 759, 64 S.W. 498, 500 (1901):

> [A] patent could not be questioned collaterally by anything dehors the patent, in the absence of a statutory provision authorizing it. It was therefore incompetent to show by parol testimony in a collateral proceeding like this that no survey of the land included in the patent

---

statute ... prevents a tenant from denying the title of his landlord. Specifically, the statute provides that 'the attornment of a tenant to a stranger shall be void, unless it be with the consent of the landlord.' "). As the dispute between the Hoskins Heirs and Bledsoe has been settled, no issue remains.

3. Leslie County was not formed until March 29, 1878. Thus, prior to that time the disputed property was part of Harlan County.

was actually made by the surveyor. Therefore the only question which remains to be considered is whether the exterior boundary of the patent relied on by appellant ... can be definitely located and determined.

"Stake patents," being as imprecise as they were, led to the use of "conditional line agreements" between adjoining neighbors, so as to avoid the inconvenience and expense of boundary line litigation. "A conditional line in eastern Kentucky is a line made by agreement of [the] parties, generally without the aid of a surveyor." *Martin v. Hall,* 30 Ky.L.Rptr. 1110, 100 S.W. 343, 344, (1907). Problematically, "conditional line agreements" were often unrecorded, yet marked and known on the ground by their creators—and *just sometimes,* their heirs.

Indeed, one might say it was tough creating land titles in the mountainous ranges of Eastern Kentucky at the time; yet, it was a beginning. It was also a time before copy machines, thus, deeds recorded in the various county court clerks' offices were handwritten into the clerk's deed books, copied from the tendered original by the clerk or deputy clerk, when time was available. KRS 382.240, 382.300, and 382.230(3). We note this point in explanation of why the wording of the old documents, as well as the signatures, acknowledgments, and certificates of the time appear to be in the same handwriting.[4] Generally, they are.

Having set the scene of the times, title to the disputed property in this matter started with Henry M. Lewis, i.e., the 500 acre Patent No. 8158. This, of course, establishes Henry M. Lewis as the common source for both parties, since both parties claim title to the disputed tract through him.

### THE BOGGS HEIRS TITLE

Upon his death, Henry M. Lewis devised his lands to four of his children by a will, recorded in the clerk's office on January 4, 1876. By deed of record dated October 3, 1881, three of the children, Wilson, Felix, and Hampton Lewis, conveyed certain properties to Silas Boggs, the Boggs Heirs' predecessor in title. The fourth child, Catherine Wells, then of Lincoln County, Kentucky, acknowledged the deed later in front of the Lincoln County Court Clerk on April 24, 1883, whereupon the original deed was re-recorded with the Leslie County Court Clerk on June 25, 1884, with the additional acknowledgment and lodgment certificate. The property conveyed therein, is described, as follows:

> [T]he following boundary of land to wit lying and being in the County of Leslie on the right hand fork of Lewis Creek Waters of the Greasy fork Beginning at two beeches about 200 yds below the mill seat, thence north 30 poles to a Stake Thence northeast to the head of the Second Hollow to a beech by the Side of the Road a corner of a Seven Hundred acre Survey made in the name of Wilson Lewis Sr Thence to the Head of ? Branch Thence with Said line to the top of the mountain Thence to the Rocky gap thence to the beginning Second tract Beginning in the Head of the Right Hand fork of Lewis Creek on Two Dogwoods Black oak and Hickory Thence with the call of the 500 acre patent to the beginning Third tract also our interest in the Land Surveyed in the name of Henry M. Lewis and Abner L. Pace on the Right hand of Lewis Creek this is to inclose all of the Land we own on the right hand fork from the Mill Seat up Also if said Survey holds any Land on the Jennas Fork of the Greasy

4. It also explains the missing punctuation at times.

Fork Said Boggs is to have it this not to include any of the Polly Lewis land nor Land of one older date with its appurtenances to have and to hold unto Silas Boggs, his heirs and assigns forever and we will warrant and defend the same with a general warrantee this day and date above witnesseth.

Subsequent thereto, by deed dated January 14, 1888, Silas Boggs conveyed property to John I. Shell described, in part, as follows:

Beginning ... on the North side of [Lewis Creek;] thence square to the top of said ridge and said Shell is to have all the land that said ... and holds on Lewis Creek from the conditional line up said creek first above mentioned[.]

Later, by deed dated October 18, 1888, Silas Boggs conveyed to James Blevins, property referenced on Lewis Creek and described, in part, as follows:

Beginning ... below the mill seat a conditional ... line between H.M. Lewis Heirs and said Boggs thence a straight line to the top of the mountain.... So as to include all of said boundary of land....

This 1888 deed is the last record transaction involving any of the Boggs Heirs, or their predecessors, in connection with the property acquired from Henry M. Lewis for the next one-hundred and three (103) years, that is until September 17, 1991, when the Boggs Heirs filed four Affidavits of Decent in the Leslie County Court Clerk's office for Silas Boggs, Lawrence Boggs, Sherman Boggs, and Laney Boggs Powell, the predecessors in title under which they now claim through descent. These affidavits were notarized by Gary Hale, who at the time was employed as land man for Bledsoe, through its parent company. Mr. Hale was married to the daughter of Ben Boggs, Jr., one of the Boggs Heirs. He testified in his deposi-

tion that, as an employee of Bledsoe, he first saw a title opinion referencing a potential claim of the Boggs Heirs under the 1881 Silas Boggs deed in 1989 or 1990. In his deposition, he was somewhat vague as to whether he ever mentioned this to any of the Boggs Heirs.

Thereafter, on May 22, 1992, Shamrock Coal Company (Shamrock), who already had several operating agreements with Bledsoe, including an assigned lease of the disputed tract *from the Hoskins Heirs,* acquired a lease of the disputed tract from several members of the Boggs Heirs. Then, on November 4, 1992, Shamrock, pursuant to an asset purchase agreement, assigned both leases to the disputed tract back to Bledsoe. There is evidence in the record to support a finding that the Boggs Heirs only began paying taxes on the property sometime after its mining began under their lease, around 1997.

### THE HOSKINS HEIRS TITLE

The Hoskins Heirs also trace their chain of title back to the Henry M. Lewis patent through alleged conveyances from his children. These deeds purport to convey the children's, or their successors, remaining interest in the Henry M. Lewis 500 acre Patent No. 8158. For example, the deed from Hampton Lewis to James Hoskins, dated February 15, 1897, conveys Hampton Lewis's undivided interest in Patent No. 8158, which then states: "reference is also made to the deed made by the Heirs of Henry M. Lewis to Silas Boggs for land on the right fork of Lewis Creek which is to be excluded...." The August 26, 1903, conveyance from A.B. Culton, Mary R. Jarvis, et ux., M.R. Culton, and J.M. Culton, et. ux., purports to convey an undivided one-half interest in the disputed tract, to-wit: "on the waters of Rockhouse fork of Greasy ..., containing 155.58 acres, and being a part of and wholly embraced with-

in and by the Henry M. Lewis 500 acres grant # 8158...." Felix Lewis also conveyed "all [his] undivided interest in and to Patent No's 8158 ...," excepting "the lands heretofore sold to Silas Boggs by the Henry M. Lewis Heirs...."

Importantly, if the heirs of Henry M. Lewis had in fact already conveyed the full boundary of Patent No. 8158 to Silas Boggs extending over onto Rockhouse Creek, there could be no part of the patent left to convey in subsequent deeds.[5] The Hoskins Heirs allege that each of the Henry M. Lewis children's interests was eventually conveyed to A.J. Asher and W.J. Hodges through a series of conveyances from 1887 through 1907 and that C.W. Hoskins ultimately purchased their interest in May of 1941. This interest was later conveyed by his heirs into the C.W. Hoskins Heirs Partnership in 1987.

## LEASING OF THE PROPERTY

The Hoskins Heirs began leasing the property for mining in 1976. The first lease was to GRI Coal Holding (Kentucky), Inc. GRI assigned the lease to Bledsoe with the Hoskins Heirs' approval in April of 1980. Other than an assignment of the lease to Shamrock from June 1991 until November 1992, Bledsoe has held the Hoskins Heirs lease continuously as amended from time to time.

## TITLE OPINIONS

During this time, both the Hoskins Heirs and Bledsoe sought and received title opinions on the disputed tract.[6] In March 1985, Joseph K. Beasley issued an opinion stating that it was his opinion that Silas Boggs *did not obtain title* to the disputed tract via the October 3, 1881 deed from the heirs of Henry M. Lewis. In his opinion, he stated:

Under the deed, tract 2, apparently includes by perimeter a description of ... patent no. 8158, however, this deed in my judgment and opinion, does not convey all of the land referred to in the patent, but restricts it by language further down the deed, from which I quote as follows:

'This is to enclose all of the land we own on the right hand fork from the Mill Seat up,...'

The above quotation in my opinion narrows the description and the quantity of land in the conveyance and therefore, the full and complete title to the whole 500 acres does not pass to Mr. Boggs.

In April 1985, Bledsoe received a title opinion from Stoll, Keenon & Park, that *the Hoskins Heirs had marketable title* to the disputed tract and that Bledsoe therefore had a vested *leasehold* interest in the property. This title opinion, in its exceptions, also analyzed the impact, if any, of the October 3, 1881 deed to Silas Boggs, concluding:

5. Although we express no opinion on the admissibility of the alleged May 16, 1901 deposition of Silas Boggs for reasons that the trial court has not had a chance to address its' authenticity and trustworthiness, KRS 422.200, 422.240, and 422.250, *see also Mayo v. Emery*, 103 Ky. 637, 45 S.W. 1048 (1898), we note for the context of our consideration of the issues relating to the trial court's summary judgment, that when allegedly asked in the alleged deposition what he had purchased from the Heirs of Henry M. Lewis, Silas Boggs allegedly said, "[a]ll the lands that the

heirs of Henry M. Lewis owned in the right fork of Lewis' Creek above the conditional line at the two beeches which stood below the mill seat." In another part of the alleged deposition, he allegedly answered, that the conveyance to him, "included a part of a five hundred acre survey made in the name of Henry M. Lewis ..."

6. Conversely, there is no reference in the record that the Boggs Heirs ever sought an opinion.

Based upon information currently available to us and upon our review of deeds both within our chain of title and outside our chain of title which convey property located in the general area of Tract 6–D, we believe Felix Lewis et. al., did not intend to convey that portion of the Patent No. 8158 which encompasses parcel E ... to Silas Boggs ...; however, the ultimate effect of said deed is a matter of construction based upon the intent of the parties, and we express some reservation as to the legal sufficiency of the language contained therein apparently employed for purposes of exclusion of that portion of Patent No. 8158 which encompasses parcel E hereinabove disclosed.[7],[8]

In 1991, Leonard Brashear checked the title again for Shamrock. He was of an opposite opinion, i.e., that the October 3, 1881 deed *did convey title* to the disputed tract to Silas Boggs, although he did not express his reasoning.

It appears the question of title between the Hoskins Heirs and Boggs Heirs may have first been noted by the coal companies in connection with an April 26, 1979, sub-lease from GRI to Bledsoe. This supposition is based upon a partial lease found in the trial court record and containing what appears to be an incomplete insert containing a page from an old title abstract and certification, which noted the October 3, 1881, adverse conveyance from the children of Henry M. Lewis to Silas Boggs. How this excerpt from an abstract or certification got inside portions of a sublease is unknown. However, it is quite normal for a coal company to check its title prior to expending enormous sums thereon for mining operations.

## Mining Activity on the Disputed Tract

Although leasing of the disputed tract by the Hoskins Heirs for mining purposes began in 1976, Bledsoe, for many years, did not conduct any actual mining on it.

Evidence from the record, however, would support a finding that during this time, the Hoskins Heirs acted as owners of the property and Bledsoe undertook numerous acts pursuant to its lease with them. For example, the Hoskins Heirs paid the property taxes and the un-mined mineral taxes on the disputed tract, while Bledsoe paid the Hoskins Heirs advance, or minimum, royalties for the property under lease. Ben Boggs, in his 2001 deposition, notes the Boggs Heirs began paying property taxes on the property, "four or five years ago, something like that ..." As royalties were paid to the Boggs Heirs by Bledsoe, beginning around 1997, this could coincide with the payment of taxes by the Boggs Heirs.

In addition to paying advance, or minimum, royalties under its' lease with the Hoskins Heirs, Bledsoe also entered onto the property and surveyed the land, built haulage roads on the property, and obtained permits to mine the property, while adjacent land owners sought and received reciprocal consent to traverse the property from Bledsoe under its' lease. All of these acts were undertaken by Bledsoe pursuant to its lease with the Hoskins Heirs and all were prior to the Boggs Heirs' lease.

7. The parties in their briefs discuss an additional Stoll, Keenon & Park opinion of the same date; however, this opinion appears to pertain to property of the Henry M. Lewis Patent No. 1858 on Lewis Creek and Lick Creek.

8. Of note, Stoll, Keenon & Park read the alleged limitation in the subject deed, to say "include." Mr. Beasley read it to say "enclose." A cursory view indicates it says "inclose."

In addition, certain coal on the disputed tract was mined by Stansbury & Company, pursuant to a conveyance to them by the Hoskins Heirs at the request of Bledsoe. This was on February 4, 1983, when the number nine seam of coal on a part of the disputed tract was sold by the Hoskins Heirs, at the request of Bledsoe, to Stansbury & Company, Inc. This portion was originally prospected in 1976 and between 1983 and 1994, it was mined. The mining would have been obvious to anyone in the area who cared to look, as it was contour surface mining. Moreover, the mining permit was issued in accordance with law and only after public notice. No objection to the issuance of this permit, or this mining, was ever made by the Boggs Heirs from the record before us.

*According* to Bledsoe, it conducted no mining on the disputed tract until June of 1997. However, when mining began, the royalties from the mining were paid initially to the Boggs Heirs. In December 1997, after complaint by the Hoskins Heirs, Bledsoe began withholding the royalties. It commenced the interpleader litigation in the Leslie Circuit Court on September 4, 1998.

Thereafter, on March 21, 2001, the Boggs Heirs filed a motion for summary judgment claiming that Silas Boggs took title to the disputed tract via the October 3, 1881 deed and that the property had passed to them through mense descent. The Hoskins Heirs responded and also moved the Leslie Circuit Court for summary judgment on their counterclaim against Bledsoe, as well as on their crossclaim against the Boggs Heirs.

Then, by order dated November 13, 2001, the court set aside the scheduled trial date of November 14, 2001, and scheduled the motions for judgment con-

ference on December 3, 2001. On June 5, 2002, finding that "[t]here is no genuine issue of material fact as to the execution, delivery or recordation of the 1881 deed to Silas Boggs." and that "[t]he construction of a deed is a matter of law with the intention of the parties to be gathered from the four corners of the instrument ....[,] unless a ambiguity exists in the deed which will not permit its construction without looking at the outside evidence ..." the Court entered Findings of Fact, Conclusions of Law and Judgment, finding the October 3, 1881 deed to Silas Boggs to be *unambiguous* and therefore entered judgment on behalf of Appellees, the Boggs Heirs, dismissing all claims of Hoskins Heirs against both the Boggs Heirs and Bledsoe.[9]

### THE OCTOBER 3, 1881 DEED IS AMBIGUOUS

■ By virtue of its summary judgment, the trial court found there was no ambiguity in the October 3, 1881 deed from Henry M. Lewis to Silas Boggs. Citing the two separate references contained in the deed, allegedly limiting the conveyance to property on the right fork of Lewis Creek, the Hoskins Heirs assert that the court erred in not finding the deed to be ambiguous and in not considering extrinsic evidence offered as to the intention of the parties. The Boggs Heirs, on the other hand, contend the deed is not ambiguous and thus, the general description must yield to the particular description.

In *Letcher County Coal & Imp. Co. v. Marlowe*, 398 S.W.2d 870, 873 (Ky.1966), we noted:

> It is generally recognized that where a deed contains both a general and a particular description and contains no lan-

---

9. As aforementioned, all questions between the Hoskins Heirs and Bledsoe were settled

during the pendency of the matter before the Court of Appeals.

guage indicating which description shall prevail, the general must yield [to] the particular. On the other hand, where it is manifest from the entire instrument that the general description, in view of the facts and circumstances surrounding the transaction, most clearly reflects the intention of the grantor, the construction will be adopted which gives it full effect. (Internal citations deleted). *See also Hatcher v. Virginia Mining Co.*, 214 Ky. 193, 282 S.W. 1102, 1104 (1926).

Moreover, "[i]n determining the intention of the parties, courts look at the whole deed, along with the circumstances surrounding its execution, and courts may also consider the acts of the parties following the conveyance." *Arthur v. Martin*, 705 S.W.2d 940, 942 (Ky.App.1986). Then, if the ambiguity is not resolved by extrinsic evidence of the parties' intentions, "[t]he rule is ... well settled that the deed will be construed most strongly against the grantor and in favor of the grantee if it admits of two constructions." *Franklin Fluorspar Co. v. Hosick*, 239 Ky. 454, 39 S.W.2d 665–66 (1931). *See also Croley v. Round Mountain Coal Co.*, 374 S.W.2d 852, 854 (Ky.1964)("Since we think the meaning of the reservation is plain, there is no occasion to apply the rule that in case of ambiguity a deed will be construed most strongly against the grantor."). A deed "is ambiguous when its language is reasonably susceptible of different constructions." *Blevins v. Riedling*, 289 Ky. 335, 158 S.W.2d 646, 648 (1942).

Of course, "[t]he construction of a deed is a matter of law, and [absent an ambiguity,] the intention of the parties is to be gathered from the four corners of the instrument." *Phelps v. Sledd*, 479 S.W.2d 894, 896 (Ky.1972). Thus, the "court may not substitute what [a] grantor

may have intended to say for what was said." *Id.* "It is [however,] to be assumed that the parties to a deed intended each of its provisions to have some effect from the very fact that the words were used [and][t]he rule is well settled that words in a deed that are not technical must be construed as having their ordinary connotation." *Id.*

Whether or not there is an ambiguity in this instance must be determined from a reading of the premises, granting, and habendum clauses of the October 3, 1881 deed to Silas Boggs. The premises clause describes the property as "lying and being ... on the right hand fork of Lewis Creek...." The granting clause consists of three tracts, the second of which describes the Henry M. Lewis 500 acre patent (Patent No. 8158), portions of which would otherwise extend over onto Rockhouse Creek. The third tract conveys Henry M. Lewis' interest in the land surveyed "in the name of Henry M. Lewis and Abner L. Pace on the Right hand of Lewis Creek." This survey, from maps of record, lies on the opposite side of the Henry M. Lewis 500 acre patent—*the side away from Rockhouse Creek* and is basically centered in the middle of the right hand fork of Lewis Creek touching portions of Rockhouse Creek only on two tips of the patent or survey.

Immediately following the grant of the third tract is the language "this is to inclose [10] all the Land we own on the right hand fork from the Mill Seat up." The trial court, in finding no ambiguity, construed this language, and the subsequent habendum clause, to be part of the third tract grant paragraph, rather than a limitation upon the granting clause, including tracts one, two, and three. This construction would, of course, limit the habendum

---

**10.** As this Court does not make Findings of Fact, we write it only as we read it.

clause, i.e., the grant to "Silas Boggs, his heirs and assigns forever, and we will warrant and defend the same with a general warrantee this day and date above witnesseth," to only the third tract, as opposed to its natural and normal reference to all grants contained in the deed.

More importantly, however, it is to be noted from the deed, maps, and testimony of record, *that the grant in tract three*, i.e., the Henry M. Lewis and Abner L. Pace survey aforementioned, *did not include (or inclose) all the land Henry M. Lewis owned at the time on the right hand fork "from the Mill Seat up."* This could lead one to conclude that the statement referenced all three tracts contained in the granting clause. That being said, if it was intended to be a part of, and thus limited in its reference, to only the third tract, such logic would necessarily limit the habendum clause to the third tract, inconsistent with all normal rules of construction and drafting. Of course, one might speculate that in 1881, thirty-six years after the original survey, Henry M. Lewis and his children did not yet know the Patent lapped over into Rockhouse Creek, but one might find this to be inconsistent with subsequent land transfers in the area by the Henry Lewis Heirs and others, as is suggested by the 1985 Stoll, Keenon & Park title opinion. Moreover, the suggested limitation appears in the deed in two separate places and "[i]t is to be assumed that the parties to a deed intended each of its provisions to have some effect from the very fact that the words were used." *Phelps*, 479 S.W.2d at 896.

The Boggs Heirs cite *Marlowe*, 398 S.W.2d at 873, *Hatcher*, 282 S.W. at 1104, and *Bland v. Kentucky Coal Corporation*, 306 Ky. 1, 206 S.W.2d 62, 63 (1947), in arguing that a particular description of

property *always controls* over a general description. We have previously cited *Marlowe* to the contrary and further note the following quote from *Hatcher*:

> That general rule, however, like most others in the law, is subject to exceptions, chief among which is that, if it appears from the conveying instrument, the surroundings of the parties, and their interpretation of it afterwards, it was the intention of the parties to give effect to the general description, and for it to prevail over the particular one, then that interpretation will be administered....

*Id.* at 1104. *Bland* deals only with the general rule, not the exceptions. *Bland*, 206 S.W.2d at 64.

Thus, because the deed is reasonably susceptible of differing constructions, we conclude that the deed at issue in this case is ambiguous, and that the court erred in not so finding. Having thus erred, it should consider on remand any admissible extrinsic evidence [11] concerning the ambiguity in determining the intent of the parties as to what was to be conveyed, prior to, or in aid of, determining the appropriate rules of constructions to be applied.

### SUMMARY JUDGMENT WAS ALSO IMPROPER BECAUSE THERE WERE MATERIAL ISSUES OF FACT

▇▇▇▇ We noted in *First Federal Savings Bank v. McCubbins*, 217 S.W.3d 201 (Ky.2006), that:

> The proper standard of review on appeal when a trial judge grants a motion for summary judgment is whether the trial judge correctly found that there were no genuine issues as to any material fact and that the moving party was entitled

---

11. As afore indicated, we express no opinion as to the admissibility of any of the extrinsic

evidence offered in this case as said issues have yet to be considered by the trial court.

to a judgment as a matter of law. CR 56.03. It has long been held that a trial judge must view the evidence in the light most favorable to the nonmoving party, and summary judgment should be granted only if it appears impossible that the nonmoving party will be able to produce evidence at trial warranting a judgment in his favor. The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists and then the burden shifts to the party opposing summary judgment to produce at least some affirmative evidence showing that there is a genuine issue of material fact requiring trial.

*Id.* at 203 (Citations omitted). Although the parties disagree whether the judgment of the court was in fact a summary judgment or a judgment on the merits, we note from the court's order on November 13, 2001, that the scheduled trial date of November 14, 2001, was cancelled as the court had been advised by the parties of "their belief that the case could be disposed of by the cross-motions for summary judgment presently pending with the court." The case was then set for judgment conference. Moreover, in its Conclusions of Law, the court noted "there is no genuine issue of material fact as to the execution, delivery, or recordation of the 1881 deed to Silas Boggs," as well as, "the construction of a deed is a matter of law with the intention of the parties to be gathered from the four corners of the instrument." [12] The court then "adjudged that the heirs of Silas Boggs are the owners of the portion of [the] patent lying on Rockhouse Creek," although the October 3, 1881 deed to Silas Boggs could have only conveyed title to him, not to his heirs.

The fact that they were the owners of this interest, had it passed to Boggs, requires a separate finding which was not addressed by the court as was contended for by the Hoskins Heirs in their "Supplemental Authority in Support of [their] Motion for Summary Judgment." This is also the point of some of the extrinsic evidence offered, the admissibility of which was not addressed due to the determination of no ambiguity.

There being genuine issues of material fact existing at the time, the entry of summary judgment was therefore in error.

## CONCLUSION

For the reasons set forth herein, the opinion of the Court of Appeals is reversed and the judgment of the trial court is vacated in regards to all issues arising from the cross-claims of the Hoskins Heirs and Boggs Heirs. This matter is thus remanded back to the Leslie Circuit Court for further proceedings consistent herewith.

LAMBERT, C.J., ABRAMSON, CUNNINGHAM, NOBLE and SCHRODER, JJ., concur.

MINTON, J., not sitting.

---

**12.** The Appellees note in their brief that, "this argument is really only academic since the issue to be determined was a question of law and one properly addressed by summary judgment."